UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| COSTCO WHOLESALE CORPORATION, | No. |
| Plaintiff, | COMPLAINT AND JURY DEMAND |
| v. | |
| HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; IRICO GROUP CORPORATION; IRICO GROUP ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES CO., LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL LTD.; BEIJING MATSUSHITA COLOR CRT CO., LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V.; PHILIPS ELECTRONICS NORTH AMERICA CORPORATION; PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.; PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMTEL COLOR LTD.; THAI CRT CO., LTD.; TOSHIBA CORPORATION; TOSHIBA AMERICA, INC.; TOSHIBA | |

COMPLAINT AND JURY DEMAND – 1

AMERICA CONSUMER PRODUCTS,
LLC; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; CHUNGHWA
PICTURE TUBES, LTD.; CHUNGHWA
PICTURE TUBES (MALAYSIA);
TATUNG COMPANY OF AMERICA,
INC.

Defendants.

Plaintiff Costco Wholesale Corporation brings this action for damages and injunctive

relief under the antitrust laws of the United States and of the states of California, Arizona,

Florida, Illinois, and Washington.  Costco alleges as follows based on information including the

pleas and prosecutions of certain Defendants and their executives as well as allegations in the

complaints of the direct and indirect purchaser classes and of other direct action plaintiffs,

allegations that were in some cases tested by motions to dismiss in MDL No. 1917.

## INTRODUCTION

1.       Defendants and their co-conspirators formed an international cartel that conducted

a conspiracy extending at a minimum from March 1, 1995, through November 25, 2007 (the

"Relevant Period" in terms of unlawful acts) for the purpose and to the effect of raising or

maintaining prices and reducing capacity and output for cathode ray tubes ("CRTs").  The effects

of the conspiracy on prices lasted into at least 2008.

2.       Defendants are or were among the leading manufacturers of: (a) color picture

tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes

("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices

containing CPTs (such as televisions) or CDTs (such as computer monitors).  For the purposes of

this Complaint, CPTs of all sizes and the products containing them are referred to collectively as

"CPT Products."  Also for the purposes of this Complaint, CDTs of all sizes and the products

COMPLAINT AND JURY DEMAND – 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

containing them are referred to as "CDT Products."  CDT Products and CPT Products are referred to collectively as "CRT Products."

3.      Defendants control the CRT industry, a multibillion dollar market.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product. The conspiracy was directed at the United States and was intended to substantially affect prices and supply in the United States, including prices paid by and the supply available to Plaintiff.

4.      Since the mid-1990s, the CRT industry faced significant economic pressure as customer preferences for new technologies shrank profits and threatened the industry.  To increase profitability and decrease the erosion of pricing in the CRT market, Defendants conspired to fix prices.

5.      Defendants or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange enabling information on shipments, prices, production, customer demand, and other factors; (c) coordinate public statements regarding capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain customers; (i) allocate customers and each producer's share of key customers' sales; and (j) restrict output.

6.      The conspiracy concerning CRTs began at least as early as March of 1995 with bilateral meetings.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 conspiracy meetings and communications during the Relevant Period.  Meetings occurred in locales including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K., and Europe and included representatives from the highest levels of the companies, as well as regional managers and others.

COMPLAINT AND JURY DEMAND – 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

7.     The conspiracy affected billions of dollars of commerce throughout the United States.

8.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by foreign competition authorities.  The first participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco on February 10, 2009.  Since then, five more individuals have been indicted in connection with Defendants' CRT price-fixing conspiracy.

9.     Throughout the Relevant Period, the conspiracy moderated the normal downward pressure on prices caused by periods of oversupply, process and other efficiency gains, and technological change.  The prices of producers who were not members of the conspiracy were also higher as a result of the conspiracy than they otherwise would have been.  Defendants' conspiracy resulted in unusually long periods of higher prices and higher profits.  Even when prices declined, they declined from supra-competitive levels, rather than levels set by free and open competition, and prices declined less than they would have in a competitive market.  As a result of Defendants' unlawful conduct, Plaintiff paid higher prices for CRT Products from any source than it would have paid in a competitive market.

10.     During the Relevant Period, Costco purchased CRT Products in the United States directly and indirectly from Defendants.  Costco thus suffered damages as a result of Defendants' conspiracy, and brings this action to recover the overcharges paid for the CRT Products containing price-fixed CRTs it purchased during the Relevant Period.

## PARTIES

**A.    Plaintiff**

11.     Plaintiff Costco Wholesale Corporation is now a Washington corporation with its principal place of business in Issaquah, Washington.  Costco operates throughout the United States and elsewhere and sold CRT Products in its warehouses and on its website, Costco.com.

COMPLAINT AND JURY DEMAND – 4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

12.     Costco Wholesale Corporation is the result of the combination of two companies: Costco and Price Club. Price Club was founded in San Diego, California, in 1976, and grew to 76 United States stores by 1992, with over half in California. Costco was founded in 1983 in Washington and by 1992 had over 90 stores nationwide, with nearly half in California. In 1993, Costco and Price Club merged, and Price/Costco, Inc. was formed and incorporated in Delaware. As the new name suggested, the two companies were not fully integrated for many years, and the company had two principal executive offices, in San Diego, California, and Kirkland, Washington. Many headquarters functions continued in California during the Relevant Period. In 1999, the company changed its name to Costco Wholesale Corporation and reincorporated in Washington.

13.     During the Relevant Period, Costco purchased in the United States large numbers of CRT Products whose prices were inflated by the conspiracy. Costco purchased and sold more such CRT Products in California than in any other state during the Relevant Period. Costco's negotiations for the purchase of CRT Products took place primarily in the United States, and the basic choice of vendors was made from the company's headquarters. Decisions among approved vendors and as to volumes to purchase were made in, and Costco purchase orders were created in and issued from, regional offices located in multiple states including California, Washington, Texas, Virginia, and Georgia. Costco issued more purchase orders for CRT Products from California than from any other state. The purchase orders reflected the volumes affected by and incorporated the supra-competitive prices resulting from the conspiracy. Invoices were sent to Costco in Washington, with the invoices reflecting volumes and prices specified in purchase orders issued from the regional offices.

14.     Costco received CRT Products at distribution centers located in states including California, Washington, Illinois, Arizona, Utah, Texas, New Jersey, Georgia, and Florida. Costco received far more CRT Products in California than in any other state.

COMPLAINT AND JURY DEMAND – 5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

15.    Costco felt the effects of Defendants' conspiracy in all of its stores, as elevated prices for CRT Products reduced sales of those products in each store, and reduced store income, profits, and employment needs.

16.    Costco purchased finished products containing CRTs from some Defendants and co-conspirators, from affiliates of some Defendants and co-conspirators, from companies that have other important business arrangements with Defendants and co-conspirators, from companies that cannot bring claims of their own due to the Foreign Trade Antitrust Improvements Act, and from companies that have since gone out of business.  There is no realistic possibility that these sellers will seek to recover for the damage caused by the conspiracy, and in fact they did not seek to recover before the expiration of the statute of limitations.  Many such sellers had their United States or only headquarters or centers of operations in California and both paid overcharges there and passed them onto Costco there.

**B.    Defendants**

**1.    Hitachi Entities**

17.    Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

18.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at AKS Building 5F, Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.  Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing, and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant

COMPLAINT AND JURY DEMAND – 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Period, Hitachi Displays manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

19.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi America manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

20.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendant Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

21.     Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 208 Fairforest Way, Greenville, South Carolina 29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During the Relevant Period, HEDUS manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

COMPLAINT AND JURY DEMAND – 7

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

22.     Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25 percent interest in Hitachi Shenzhen until November 8, 2007 (which was around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Relevant Period.  During the Relevant Period, Hitachi Shenzhen manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

23.     Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, HEDUS, and Hitachi Shenzhen are collectively referred to as "Hitachi."

**2.     IRICO Entities**

24.     Defendant IRICO Group Corporation ("IGC") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, distribution and sale of CRT Products.  During the Relevant Period, IGC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

25.     Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by Defendant IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  The website also claims that in 2003, IGE was the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit, and taxation.  During the Relevant Period,

COMPLAINT AND JURY DEMAND – 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

IGE manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies, and affairs of IGE relating to the antitrust violations alleged in this complaint.

26.     Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of Defendant IGC.  In 2006, IDDC was China's top CRT maker.  During the Relevant Period, IDDC manufactured, marketed, distributed, and sold CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant IGC dominated and controlled the finances, policies, and affairs of IDDC relating to the antitrust violations alleged in this complaint.

27.     Defendants IGC, IGE, and IDDC are collectively referred to as "IRICO."

**3.     LG Electronics Entities**

28.     Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea.  LGEI is a $48.5 billion global force in consumer electronics, home appliances, and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LGEI transferred its CRT business to a 50/50 joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD").  On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd.  During the Relevant Period, LGEI manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

COMPLAINT AND JURY DEMAND – 9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29.     Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.  LGEUSA is a wholly-owned and controlled subsidiary of Defendant LGEI.  During the Relevant Period, LGEUSA manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

30.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.  LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc.  During the Relevant Period, LGETT manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant LGEI dominated and controlled the finances, policies, and affairs of LGETT relating to the antitrust violations alleged in this complaint.

31.     Defendants LGEI, LGEUSA, and LGETT are collectively referred to as "LG Electronics."

**4.      LP Displays**

32.     Defendant LP Displays International Ltd. f/k/a LGPD ("LP Displays") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.  LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between Defendants LGEI and Royal Philips.  In March 2007, LP Displays became an independent company.  LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27 percent.  LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms.  During the Relevant Period, LP Displays

COMPLAINT AND JURY DEMAND – 10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**5.     BMCC**

33.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China.  BMCC is a joint venture company, 50 percent of which is held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-owned enterprise).  BMCC is the second largest producer of CRTs for televisions in China.  During the Relevant Period, BMCC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

**6.     Philips Entities**

34.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics ("Royal Philips") is a Dutch company with its principal place of business located at Breitner Center, Amstelplein 2, Amsterdam, 1096 BC, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001, Royal Philips transferred its CRT business to a 50/50 joint venture with Defendant LGEI, forming Defendant LGPD (n/k/a LP Displays).  In December 2005, as a result of increased pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book value of 126 million Euros of its investment and said it would not inject further capital into the venture. During the Relevant Period, Royal Philips manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

35.    Defendant Philips Electronics North America Corporation ("Philips America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the

COMPLAINT AND JURY DEMAND – 11

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

Americas, New York, New York 10020-1104.  Philips America is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips America relating to the antitrust violations alleged in this complaint.

36.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Taiwan manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

37.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies, and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

38.     Defendants Royal Philips, Philips America, Philips Taiwan, and Philips Brazil are collectively referred to as "Philips."

**7.     Samsung Entities**

39.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at Samsung Electronics Building, 1320-10, Seocho 2-

COMPLAINT AND JURY DEMAND – 12

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

dong, Seocho-gu, Seoul 137-857, South Korea.  It is South Korea's top electronics company.  During the Relevant Period, SEC manufactured, marketed, sold, and distributed CRT Products, either directly or through subsidiaries or affiliates, throughout the United States.

40.    Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.  SEAI is a wholly-owned and controlled subsidiary of Defendant SEC.  During the Relevant Period, SEAI manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant SEC dominated and controlled the finances, policies, and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

41.    Defendants SEC, SEAI, and their subsidiaries and affiliates are collectively referred to as "Samsung."

**8.    Samtel**

42.    Defendant Samtel Color Ltd. ("Samtel") is an Indian company with its principal place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.  Samtel's market share for CRTs sold in India is approximately 40 percent, and it is that country's largest exporter of CRT Products.  Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CRT Products.  During the Relevant Period, Samtel manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries and affiliates, throughout the United States.

**9.    Thai CRT**

43.    Defendant Thai CRT Co., Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold, and

COMPLAINT AND JURY DEMAND – 13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

### 10. Toshiba Entities

44. Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors.  In December 1995, TC partnered with Orion Electronic Co. and two other non-defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC consolidated its CRT business into MTPD, a joint venture.  During the Relevant Period, TC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

45. Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020.  Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC.  During the Relevant Period, Toshiba America manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

46. Defendant Toshiba America Consumer Products, LLC ("TACP") is a limited liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TACP manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TACP relating to the antitrust violations alleged in this complaint.

COMPLAINT AND JURY DEMAND – 14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

47.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAEC manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TAEC relating to the antitrust violations alleged in this complaint.

48.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92618-1697.  TAIS is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America.  During the Relevant Period, TAIS manufactured, marketed, sold, and distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.  Defendant TC dominated and controlled the finances, policies, and affairs of TAIS relating to the antitrust violations alleged in this complaint.

49.     Defendants TC, Toshiba America, TACP, TAEC, and TAIS are collectively referred to as "Toshiba."

**11.    Chunghwa Entities**

50.     Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan, Taiwan.  It was established in 1971 by Tatung Corporation to manufacture CRTs.  In 1974, Chunghwa PT's CRTs received certification by the United States, giving the company entry into that market.  Chunghwa PT's Board of Directors includes representatives from Tatung Company, and its Chairman is also the Chairman and General Manager of Tatung Company.  Throughout the Relevant Period, Chunghwa PT was one of the major global CRT manufacturers.  During the Relevant Period, Chunghwa PT manufactured, sold, and distributed CRT Products either directly

COMPLAINT AND JURY DEMAND – 15

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

or through its subsidiaries or affiliates (such as its Fuzhou subsidiary) throughout the United States.

51.     Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  It is a wholly-owned and controlled subsidiary of Chunghwa.  Chunghwa Malaysia is focused on CRT production, and it has established itself as one of the leading worldwide suppliers of CRTs. During the Relevant Period, Chunghwa Malaysia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Chunghwa PT dominated and controlled the finances, policies, and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this complaint.

52.     Defendants Chunghwa PT and Chunghwa Malaysia are collectively referred to as "Chunghwa."

### 12.     Tatung Company of America, Inc.

53.     Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business located at 2850 El Presidio Street, Long Beach, California. Tatung America is a subsidiary of Tatung Company.  Currently, Tatung Company owns approximately half of Tatung America.  The other half used to be owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin.  Following Lun Kuan Lin's death, her shares passed to her two children.  During the Relevant Period, Tatung America manufactured, marketed, sold, and distributed CRT Products manufactured by, among others, Chunghwa Picture Tubes, Ltd., either directly or through its subsidiaries or affiliates throughout the United States.

COMPLAINT AND JURY DEMAND – 16

29040-0244/LEGAL22131652.4

## C.   Agents and Co-Conspirators

54.   The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management and operation of Defendants' businesses or affairs.

55.   Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and course of conduct alleged by Costco.

56.   When Plaintiff refers to a corporate family or companies by a single name in allegations of participation in the conspiracy, it is to be understood that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.

57.   Individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate families were represented in meetings and discussions by their agents and were parties to the agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate families distributed CRT Products, these subsidiaries played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products would not undercut the pricing agreements reached at these various meetings.  Thus, all entities within the corporate families were active, knowing participants in the alleged conspiracy.

58.   Various persons or firms not named as Defendants participated as co-conspirators in the alleged violations, performed acts, and made statements in furtherance of the conspiracy, and manufactured, sold, and distributed CRT Products to customers in the United States.  These co-conspirators include, but are not limited to: Mitsubishi Electric Corporation, Orion Electronic Co., Daewoo Electronics Co., Ltd., Daewoo-Orion Société Anonyme, PT.MT Picture Display Indonesia, P.T. Tosummit Electronic Devices Indonesia ("TEDI"), and Toshiba Display Devices

COMPLAINT AND JURY DEMAND – 17

(Thailand) Co., Ltd.  Plaintiff reserves the right to name some or all of these and other co-conspirators as Defendants at a later date.

### JURISDICTION AND VENUE

59.     Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust laws of California, Washington, Arizona, Florida, and Illinois.

60.     This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of the antitrust laws of the United States, including Section 1 of the Sherman Act, 15 U.S.C. § 1.  The jurisdiction of this Court is founded on those sections and on 28 U.S.C. § 1331, which provides this Court with original jurisdiction over actions arising under the laws of the United States, and 28 U.S.C. § 1337, which provides this Court with original jurisdiction over any action arising under federal laws regulating commerce or protecting commerce against restraints and monopolies.  This Court has jurisdiction over the state law claims under 28 U.S.C. § 1332 or, alternatively, 28 U.S.C. § 1367.

61.     Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this district and a substantial portion of affected interstate commerce was carried out in this district.

62.     Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of Washington.

63.     Related cases are pending in MDL No. 1917 in the Northern District of California, and this matter should be consolidated there for pretrial purposes but returned to this district for trial.

COMPLAINT AND JURY DEMAND – 18

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

**FACTS AND BACKGROUND**

**A.    CRT Technology**

64.    A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue, and black.

65.    CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers.  After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

66.    The quality of a CRT itself determines the quality of the CRT display.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

67.    Although there have been refinements, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

68.    CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices.  The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

COMPLAINT AND JURY DEMAND – 19

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

69.     CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from the demand for such products.  The market for CRTs and the market for the products into which they are placed are inextricably intertwined because the CRT market exists to serve the CRT Products markets.  The markets for CRTs and CRT Products are effectively inseparable. Defendants are well aware of this intimate relationship.

70.     Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system.  CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product.  Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiff.

71.     Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, non-defendant original equipment manufacturers ("OEMs") had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed, and stabilized by Defendants' conspiracy.  Defendants' unlawful conspiracy has inflated the prices at which Plaintiff bought CRT Products, and Plaintiff has suffered a direct, substantial, and reasonably foreseeable injury as a result of Defendants' conspiracy.

**B.     Structure of the CRT Industry**

72.     The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

**1.     Market Concentration**

73.     During the Relevant Period, the CRT industry was dominated by relatively few companies.  In 2004, four held a collective 78 percent share of the global CRT market.  The high concentration of market share facilitates coordination because there are fewer cartel members

COMPLAINT AND JURY DEMAND – 20

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2. Information Sharing

74.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

75.     Defendants Hitachi, Samsung, and Chunghwa are all members of the Society for Information Display.  Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo and Defendants LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and their co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

76.     The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 creation of MTPD.

### 4. Multiple Interrelated Business Relationships

77.     The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion.

COMPLAINT AND JURY DEMAND – 21

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

78.   Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

a.   The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

b.   Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.   The formation of the CRT joint venture MTPD in 2003.

d.   In December 1995, Defendant Toshiba partnered with Orion and two other non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

e.   Defendant Toshiba and Orion also signed a cooperative agreement relating to LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN-LCDs, and Toshiba, which had substituted its STN-LCD production with TFT-LCD production, marketed Daewoo's STN-LCDs globally through its network.

f.   Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Defendant Chunghwa for large CPTs.

g.   Defendant Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels.  Chunghwa now licenses the technology from Defendant Philips.

h.   Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale, and distribution of optical storage products such as DVD drives.

COMPLAINT AND JURY DEMAND – 22

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

i. Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

j. Defendant Samtel claims to have supplied CRTs to Defendants including LG Electronics, Samsung, and Philips.

## 5. High Costs of Entry Into the Industry

79. There are significant manufacturing and technological barriers to entry into the CRT industry.  It would require substantial time, resources, and industry knowledge to overcome these barriers to entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

80. During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate.   A combination of price discussions and manipulation of the output of CRTs allowed Defendants to keep prices above where they would have been but for the conspiracy.

## 6. Maturity of the CRT Product Market

81. Newer industries typically are characterized by rapid growth, innovation, and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

82. Demand for CRT Products was declining through most or all of the Relevant Period.  Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

83. In addition, conventional CRT televisions and computer monitors were being replaced by LCD and plasma displays.  This was one of the factors which led Defendants to engage in price-fixing to slow the decline of CRT Product prices.  Between 2000 and 2006,

COMPLAINT AND JURY DEMAND – 23

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

84.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during most of the Relevant Period, making Defendants' collusion and the international price-fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

85.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

86.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    Homogeneity of CRT Products

87.    CRT Products are commodity-like products manufactured in standardized sizes. One Defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sold and Plaintiff purchased CRT Products primarily on the basis of price.

88.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

89.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of

COMPLAINT AND JURY DEMAND – 24

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

cooperation developed over the years, and these Defendant employees would exchange market information on production, capacity, and customers.

90.     In the early 1990s, representatives from Samsung, Daewoo, Chunghwa, and Orion visited each other's factories in Southeast Asia.  During this period, these producers began to include discussions about price in their meetings.

**D.     Defendants' and Co-Conspirators' Illegal Agreements**

91.     To control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a conspiracy, the effect of which has been to fix and maintain prices at which they sold CRTs at artificially inflated levels from at least March, 1995, through at least November 25, 2007.

92.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings and other communications and activities.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from Daewoo and Defendants LG Electronics and Samsung visited the other Defendant manufacturers to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

93.     Defendants Samsung, LG, and Chunghwa, along with Daewoo, also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

94.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.  Defendants' representatives attended hundreds of these meetings during the Relevant Period.

95.     The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRTs.

COMPLAINT AND JURY DEMAND – 25

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

1.     **"Glass Meetings"**

96.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three levels of Defendants' corporations.

97.     The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price-fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

98.     The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

99.     Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near Defendants' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

100.     The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal

COMPLAINT AND JURY DEMAND – 26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants.

101.     Glass meetings also occurred occasionally in European countries.  Attendees at these meetings included those Defendants and co-conspirators that had subsidiaries and manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and IRICO.  Chunghwa also attended these meetings.

102.     Representatives of Defendants also attended what were known in the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

103.     During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia.

104.     Participants would often exchange competitively sensitive information prior to a glass meeting.  This included information on inventories, production, sales, and exports.  For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

105.     The glass meetings at all levels followed a fairly typical agenda.  First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months.  The participants also updated the information they had provided in the previous meeting.  Each meeting had a rotating, designated "Chairman" who would write the information on a white board.  The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter.  They discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs.  They also discussed and agreed upon prices

COMPLAINT AND JURY DEMAND – 27

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.  Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

106.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions.  This was referred to as setting a "bottom price."

107.    Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs.  In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

108.    Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they were placed.  Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins.  Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers.  In this way, Defendants ensured that price increases for CRTs were passed on.

109.    The agreements reached at the glass meetings included:

a.      agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

b.      placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

c.      agreements on pricing for intra-company CRTs sales to vertically integrated customers;

COMPLAINT AND JURY DEMAND – 28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

d.    agreements as to what to tell customers about the reason for a price increase;

e.    agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f.    agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe, and India;

g.    agreements to exchange pertinent information regarding shipments, capacity, production, prices, and customer demands;

h.    agreements to coordinate uniform public statements regarding available capacity and supply;

i.    agreements to allocate both overall market shares and share of a particular customer's purchases;

j.    agreements to allocate customers;

k.    agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.    agreements to keep their meetings secret.

110.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves.  When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

111.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent.  In addition, in December 2006 the DOJ issued

COMPLAINT AND JURY DEMAND – 29

subpoenas to manufacturers of LCDs and so the CRT co-conspirators began to have concerns about antitrust liability.

### 2. Bilateral Discussions

112. Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

113. During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, and Mexico.

114. The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, and Europe.

115. To ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and Mexico.  These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products.  North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRTs imported into the United States were fixed, raised, maintained, and stabilized at supracompetitive levels.

116. Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The

COMPLAINT AND JURY DEMAND – 30

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

117.    Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT pricing and output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba, and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT.  Sometimes Hitachi and Toshiba also attended the glass meetings.

### 3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

118.    Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi.  Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung.  Through these discussions, Hitachi agreed on prices and supply levels for CRTs.  Hitachi never effectively withdrew from this conspiracy.

119.    Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them.  To the extent Hitachi America and HEDUS sold or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers

COMPLAINT AND JURY DEMAND – 31

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

120.    Between at least 1998 and 2007, Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers.  Through these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

121.    Between at least 1995 and 2001, Defendant LG Electronics, through LGEI and LGETT, participated in at least 100 glass meetings at all levels.  After 2001, LG Electronics participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG Electronics.  LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs.  LG Electronics never effectively withdrew from this conspiracy.

122.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold or distributed CRT Products, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

123.    Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG

COMPLAINT AND JURY DEMAND – 32

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Electronics and Philips.  LP Displays also engaged in bilateral discussions with other Defendants.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

124.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government.  BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

125.    Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays).  A substantial number of these meetings were attended by high level executives from Philips.  Philips also engaged in numerous bilateral discussions with other Defendants.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

126.    Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent Philips America and Philips Brazil sold or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

127.    Between at least 1995 and 2007, Defendant Samsung participated in at least 200 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with each of

COMPLAINT AND JURY DEMAND – 33

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

the other Defendants on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.  Defendant SEAI was represented at those meetings and was a party to the agreements entered at them.  To the extent SEC and SEAI sold or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.

128.     Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT.  These meetings were attended by high level executives from Samtel.  Through these discussions, Samtel agreed on prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

129.     Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings.  These meetings were attended by the highest ranking executives from Thai CRT.  Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for CRTs.  Thai CRT never effectively withdrew from this conspiracy.

130.     Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT, and TEDI, participated in several glass meetings.  After 2003, Toshiba participated in the CRT conspiracy through MTPD.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

131.     Defendants Toshiba America, TACP, TAEC, and TAIS were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, TACP, TAEC, and TAIS sold or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at

COMPLAINT AND JURY DEMAND – 34

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

the glass meetings.  Thus, Toshiba America, TACP, TAEC, and TAIS were active, knowing participants in the alleged conspiracy.

132.    Between at least 1995 and 2006, Defendant Chunghwa, through Chunghwa PT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of Chunghwa PT, C.Y. Lin.  Chunghwa also engaged in bilateral discussions with each of the other Defendants on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

133.    Defendant Tatung America was represented at those meetings and was a party to the agreements entered at them.  To the extent Tatung America sold or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings.  Thus, Tatung America was an active, knowing participant in the alleged conspiracy.

134.    Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion, and DOSA, participated in at least 100 glass meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other Defendants on a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

135.    When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings

COMPLAINT AND JURY DEMAND – 35

29040-0244/LEGAL22131652.4

and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and was a party to the agreements reached in them.

**E.     The CRT Market During the Conspiracy**

136.     Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors.  During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

137.     During the Relevant Period, North America was the largest market for CRT TVs and computer monitors.

**F.     International Government Antitrust Investigations**

138.     Defendants' conspiracy to fix, raise, maintain, and stabilize the prices of, and restrict output for, CRTs sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ").

139.     Separately, the European Commission and Japan and South Korea's Fair Trade Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in Europe and Asia.

140.     In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

141.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

COMPLAINT AND JURY DEMAND – 36

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

> The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

142.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."  The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

143.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng formerly was an assistant Vice President of Sales and Marketing at Chunghwa.  The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

144.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Chung Cheng Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer."  The

COMPLAINT AND JURY DEMAND – 37

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

145.   On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies."  The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

146.   On March 8, 2011, the DOJ issued a press release announcing that it had reached an agreement with Samsung SDI in which it would plead guilty and pay a $32 million fine for its role in a conspiracy to fix prices of CDTs.  Samsung SDI admitted that from at least as early as January 1997 until at least as late as March 2006, it participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.  Samsung SDI further admitted that acts in furtherance of the conspiracy were carried in California.

147.   Several Defendants also have a history of "cooperation" and anticompetitive conduct.  For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

148.   Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

149.   In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

COMPLAINT AND JURY DEMAND – 38

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

150.     On November 12, 2008, the DOJ announced that it had reached agreements with three LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation, and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

151.     On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of LCD panels.

## G.     The Role of Trade Associations During the Relevant Period

152.     Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display industry, including manufacturers and suppliers.  Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries."  Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC").  In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

153.     Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

154.     The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24, 2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007.  Top executives of Samsung's

COMPLAINT AND JURY DEMAND – 39

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun, and H.C. Kim of Samsung and S.T. Kim, S. Trinker, and Ney Corsino of LG Electronics.  Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

155.    Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition, the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

156.    Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what would normally be considered proprietary and competitively sensitive information.  This exchange of information was used to implement and monitor the conspiracy.

## H.    Effects of the Conspiracy

157.    The conspiracy has had the following effects, among others:

  a.     Price competition in the sale of CRTs by Defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;

  b.     Prices for CRTs sold by Defendants to Plaintiff directly and indirectly have been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and

  c.     Plaintiff has been deprived of the benefit of free and open competition in the purchase of CRT Products.

158.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products.

COMPLAINT AND JURY DEMAND – 40

29040-0244/LEGAL22131652.4

159.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has been injured in its business and property in that they paid more for CRT Products than it otherwise would have paid in the absence of the unlawful conduct of Defendants.

## FRAUDULENT CONCEALMENT

160.    Costco had neither actual nor constructive knowledge of the facts supporting its claim for relief despite diligence in trying to discover the pertinent facts.  Costco did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least late November 2007, when investigations by the United States and other antitrust authorities became widely reported.  Defendants' secret conspiracy did not give rise to facts that would put Costco on inquiry notice that there was a conspiracy to fix the prices of CRT Products.

161.    Because Defendants' conspiracy was kept secret, Plaintiff was unaware of Defendants' unlawful conduct and did not know that it was paying artificially high prices for CRT Products.

162.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions.  Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

163.    Defendants' price-fixing conspiracy was inherently self-concealing.

164.    Plaintiff could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently

COMPLAINT AND JURY DEMAND – 41

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

conceal, their conspiracy.  The conspiracy was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

165.    As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection.  Participants at glass meetings were also told not to take minutes.  Attending companies also reduced the number of their respective attendees to maintain secrecy. Defendants agreed not to publicly discuss the existence of the nature of their agreement.  During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production.  In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.

166.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

167.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a CNET News.com article.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass.  This was a pretext used to conceal the conspiracy.

168.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand for the products.  In fact, this price rise was the result of collusive conduct amongst Defendants.

COMPLAINT AND JURY DEMAND – 42

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

169.    As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

170.    In addition, when several CRT manufacturers, including Defendants Samsung, Philips, and LG Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass shells used for manufacturing CRT monitors.  In justifying this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

171.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

172.    Plaintiff is informed and believes, and thereon alleges, that Defendants' purported reasons for the price increases of CRTs were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

173.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive conduct alleged in this complaint.

## FIRST CAUSE OF ACTION
### (Violation of Section 1 of the Sherman Act)

174.    Plaintiff realleges and incorporates by reference, as if fully set forth, the allegations in paragraphs 1 through 173 above.

175.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

COMPLAINT AND JURY DEMAND – 43

176.     In particular, Defendants combined and conspired to raise and maintain prices of CRT Products sold to Costco and others in or intended for the United States.

177.     As a result of Defendants' unlawful conduct, prices for CRT Products were raised or maintained in the United States.

178.     The contract, combination, or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

179.     For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including: (a) participating in meetings and conversations to discuss the prices and supply of CRT Products; (b) communicating in writing and orally to fix target prices, floor prices, price ranges, and capacity and output for CRT Products; (c) agreeing to manipulate prices and supply of CRT Products in a manner that deprived purchasers of free and open competition; (d) issuing price announcements and price quotations in accordance with the agreements reached; (e) selling CRT Products to customers in the United States at noncompetitive prices; (f) exchanging competitively sensitive information in order to facilitate their conspiracy; (g) agreeing to maintain or lower production capacity; and (h) providing false statements to the public to explain increased prices for CRT Products.

180.     As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

### SECOND CAUSE OF ACTION
### (Violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*)

181.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 180 above.

COMPLAINT AND JURY DEMAND – 44

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

182.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*

183.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

184.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

## THIRD CAUSE OF ACTION
### (Violation of the Washington Consumer Protection Act, RCW 19.86.030)

185.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 184 above.

186.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Washington Consumer Protection Act, RCW 19.86.030.

187.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

188.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers,

COMPLAINT AND JURY DEMAND – 45

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

### FOURTH CAUSE OF ACTION
#### (Violation of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*)

189.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 188 above.

190.    Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the of the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*

191.    As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

192.    Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

### FIFTH CAUSE OF ACTION
#### (Violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*)

193.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 192 above.

COMPLAINT AND JURY DEMAND – 46

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

194.   Defendants and their co-conspirators engaged in unfair competition in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*

195.   Defendants and their co-conspirators committed acts of unfair competition by engaging in a conspiracy to fix and stabilize the price of CRT Panels as described above.

196.   Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and fraudulent independently of whether they constitute a violation of the Sherman Act.

197.   Defendants' and their co-conspirators' acts are fraudulent or deceptive.

198.   As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

199.   Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy.  These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

### SIXTH CAUSE OF ACTION
**(Violation of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*)**

200.   Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 209 above.

201.   Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the of the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*

COMPLAINT AND JURY DEMAND – 47

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29040-0244/LEGAL22131652.4

202. As a result of Defendants' unlawful conduct, Costco was injured in its business and property in that it paid more for CRT Products than it otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of CRT Products.

203. Even CRT Product manufacturers who were not part of the conspiracy charged higher prices than they otherwise would have when they were forced to pay supra-competitive prices for CRT panels due to the conspiracy. These manufacturers passed on to their customers, including Costco, overcharges caused by Defendants' and their co-conspirators' conspiracy. Costco was not able to pass on to its customers all of the overcharge caused by the conspiracy. Thus, Costco suffered injury whenever it purchased CRT Products that incorporated panels made by Defendants and their co-conspirators.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Costco demands a trial by jury as to all issues so triable in this action.

## RELIEF

Costco requests that the Court enter judgment on its behalf that:

A. Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, the Washington Consumer Protection Act, R.C.W. 19.86, the Arizona Antitrust Act, Ariz. Rev. Stat. § 14-1401 *et seq.*, the Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201, *et seq.*, and the Illinois Antitrust Act, 740 Illinois Code 10/1 *et seq.*, and Plaintiff was injured in its business and property as a result of Defendants' violations;

B. Costco shall recover damages sustained by it, as provided by the state and federal antitrust laws, in an amount to be trebled in accordance with such laws, jointly and severally against each Defendant;

COMPLAINT AND JURY DEMAND – 48

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

29040-0244/LEGAL22131652.4

C.      Defendants, their subsidiaries, affiliates, successors, transferees, and assignees, and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the alleged combination, conspiracy, or agreement;

D.      Costco shall be awarded pre-judgment and post-judgment interest at the highest legal rate from the date of the initial direct purchaser complaint;

E.      Costco shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

F.      Costco shall recover such other and further relief as the Court deems just.

DATED:  November 14, 2011

By:  s/ David J. Burman
David J. Burman #10611
Cori G. Moore #28649
Noah G. Purcell #43492
Nicholas H. Hesterberg #41970
**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000
Email:  DBurman@perkinscoie.com
        CGMoore@perkinscoie.com
        NPurcell@perkinscoie.com
        NHesterberg@perkinscoie.com
Attorneys for Plaintiff
COSTCO WHOLESALE CORPORATION

COMPLAINT AND JURY DEMAND – 49